1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RALPH MORALES,                              No.  2:20-cv-00704 DAD KJN P

12                   Plaintiff,                    ORDER AND

13           v.                                    FINDINGS & RECOMMENDATIONS

14    PETER ANASTASSIOU,

15                   Defendant.

16

17    I.     Introduction

18           Plaintiff Ralph Morales, a state prisoner proceeding with counsel, filed a civil rights action

19    pursuant to 42 U.S.C. § 1983.  In his second amended complaint, Morales alleges that defendant

20    Peter Anastassiou acted with deliberate indifference to his serious medical needs in violation of

21    the Eighth Amendment and committed medical malpractice under state law when he refused to

22    conduct a bronchoscopy to test for tuberculosis and removed part of Morales's lung and

23    surrounding lymph nodes.  (ECF No. 31.)  Pending before this Court are Anastassiou's summary

24    judgment motion (ECF No. 48), Morales's requests for judicial notice (ECF Nos. 50-2 & 58), and

25    Morales's motion for leave to file a sur-reply in opposition to the summary judgment motion

26    (ECF No. 59.).[1]  For the reasons stated below, this Court recommends granting Anastassiou's

27    _____

28    [1] On April 28, 2022, this Court granted the parties' stipulation for dismissal of defendant Wong,
      dismissed Wong from this action with prejudice, and dismissed as moot Wong's motion for

                                              1

1    motion for summary judgment and dismissing Morales's state law claim without prejudice.  (ECF

2    No. 48).  This Court denies Morales's requests for judicial notice (ECF Nos. 50-2 & 58) and

3    motion for leave to file a sur-reply in opposition to the summary judgment motion (ECF No. 59).

4    II.    Background

5           Morales filed a second amended complaint against Anastassiou on April 5, 2021, alleging

6    Eighth Amendment deliberate indifference and state law medical malpractice claims.  (ECF No.

7    31.)  Specifically, he claims that around April 2018 while he was incarcerated at Mule Creek

8    State Prison, he experienced a worsening cough and chest pain.  (Id. at 3.)  He was taken to San

9    Joaquin General Hospital for evaluation, x-rays, CT, and PET scans.  (Id.)  The scans showed a

10   mass in his lungs, and Morales indicated that he had tuberculosis 20 years ago.  (Id. at 3-4.)

11   Despite knowing the prevalence of tuberculosis in prisons and his medical history, doctors did not

12   order a tuberculosis test.  (Id. at 4.)  Instead, doctors diagnosed him with lung cancer, but did not

13   verify the diagnosis with a bronchoscopy or biopsy.  (Id.)  Dr. Wong referred Morales to Dr.

14   Anastassiou, whom he consulted with on October 31, 2018.  (Id. at 5.)  "Despite the request from

15   a pulmonologist and the doctor's orders, Dr. Anastassiou refused to do a bronchoscopy with a

16   biopsy because he insisted it was lung cancer and will be removing Plaintiff's lung and

17   surrounding lymph nodes."  (Id. at 5 (claiming that Anastassiou knew that tuberculosis could be

18   mistaken for lung cancer.))  Morales also claims that he has uncontrolled diabetes, diabetes can

19   increase the risk of developing tuberculosis, and Anastassiou knew the possible effects and

20   increased surgical risk of operating on persons with diabetes.  (Id. at 6.)

21          On November 28, 2018, Anastassiou operated on Morales and removed the upper part of

22   Morales's right lung.  (Id. at 8.)  After the surgery, Anastassiou told Morales he had tuberculosis,

23   not lung cancer.  (Id.)  Morales was treated and placed in isolation until December 10, 2018, and

24   was later transferred back to Mule Creek State Prison.  (Id.)  As a result of the surgery, Morales

25   was depressed and had damaged vocal cords and pain "under his right arm."  (Id.)

26          On May 29, 2021, Anastassiou answered the operative complaint.  (ECF No. 35.)

27   _____

28   summary judgment.  (ECF No. 56.)  Anastassiou is the only remaining named defendant in this
     action.

Anastassiou subsequently moved for summary judgment.  (ECF No. 48.)  Morales filed an

opposition to the motion for summary judgment and a request for judicial notice.  (ECF Nos. 50-

53, 55.)  In response, Anastassiou filed a reply.  (ECF No. 57.)  Morales filed a second request for

judicial notice and a motion for leave to file a sur-reply.  (ECF Nos. 58 & 59.)  Anastassiou filed

an objection to both requests.  (ECF No. 61.)

III.     Legal Standards for Summary Judgment

        "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).[2]  Under summary judgment practice, the moving party

>              always bears the initial responsibility of informing the district court
>              of the basis for its motion, and identifying those portions of "the
>              pleadings, depositions, answers to interrogatories, and admissions on
>              file, together with the affidavits, if any," which it believes
>              demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

56(c)).  "Where the non-moving party bears the burden of proof at trial, the moving party need

only prove that there is an absence of evidence to support the non-moving party's case."  In re

Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at

325); see also Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment (recognizing that

"a party who does not have the trial burden of production may rely on a showing that a party who

does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").

Indeed, summary judgment should be entered, "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial."  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

---

[2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.
However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he
standard for granting summary judgment remains unchanged."

the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings and is required to tender evidence of specific facts in the form of affidavits or admissible discovery to support its contention that a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computs., Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  T.W. Elec. Serv., 809 F.2d at 630 (quoting  First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).  "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments; see also Matsushita, 475 U.S. at 587.

In resolving a summary judgment motion, the court examines facts cited by the parties from the record including "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  The court must draw all reasonable inferences from the underlying facts in favor of the nonmoving party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Neilsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

1    (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

2    simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S.

3    at 586.  "Where the record taken as a whole could not lead a rational trier of fact to find for the

4    non-moving party, there is no 'genuine issue for trial.'"  Id. (citation omitted).

5    IV.    Request for Judicial Notice

6          Morales makes two requests for judicial notice.  Federal Rule of Evidence 201(b) provides

7    that a federal court may take judicial notice of an adjudicative fact "that is not subject to

8    reasonable dispute" if the fact "(1) is generally known within the trial court's territorial

9    jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

10   reasonably be questioned."

11         First, Morales asks this Court to take judicial notice of Medicare reimbursement rates for

12   an upper lobectomy and a mediastinoscopy and liens against Dr. Anastassiou by the Franchise

13   Tax Board, Employment Division, and the Internal Revenue Service.  (ECF Nos 50-2.)  Morales

14   argues that this evidence shows that Anastassiou was in financial distress, and therefore had a

15   financial motive to operate on Morales for higher reimbursement amount.  (ECF No. 53 at 12-13.)

16   Anastassiou objects to this request on the grounds that the evidence is not appropriate for judicial

17   notice and is irrelevant.  (ECF No. 57 at 10-11.)  This Court agrees with defendant.  There is no

18   evidence in the record to confirm that the Medicare reimbursement data accurately reflects the

19   medical procedures at issue in this case.  Additionally, although the lien information appears to be

20   related to Dr. Anastassiou, ECF No. 57 at 11, there is insufficient information for this Court to

21   verify the accuracy or substance of the information.  Morales also fails to explain how a list of

22   notice of liens and release of tax liens proves that Anastassiou made medical decisions based on

23   reimbursement rates.  See, e.g., Bryant v. Mickelsen, 551 F. App'x 348, 349 (9th Cir. 2014).

24   While the two may be correlated, there is no evidence that one caused the other.  And without

25   additional evidence proving their relationship, the evidence is not relevant to this action.  This

26   Court denies Morales's first request for judicial notice.

27         Second, Morales makes a duplicative request for judicial notice of the liens, this time

28   including the lien documentation.  (ECF No. 58.)  Anastassiou argues that this request should be

5

stricken as untimely and filed in violation of the local rules.  (ECF No. 61.)  Setting aside the timeliness issue, this Court denies Morales's request because he has not shown that this information is relevant to the case at hand.

V.      Undisputed Facts[3]

Morales was diagnosed and treated for tuberculosis in 1997.  (ECF No. 48-4 at 22-23.)  On April 15, 2019, Morales had an annual tuberculosis evaluation and testing and denied any symptoms of tuberculosis.  (Id. at 55.)

On August 16, 2018, Morales complained of sharp chest pain lasting 15-20 minutes and was transferred to Triage and Treatment Area for further evaluation.  (Id. at 38, 50.)  Dr. Justesen noted that his symptoms may be consistent with angina and referred him for further tests.  (Id. at 51.)  That same day, Morales was taken to the emergency department at San Joaquin General Hospital.  (Id. at 70-83.)  Dr. Fei Lu Ye ordered an x-ray, which showed "[m]ild nodularity in both lungs of uncertain etiology. These could reflect calcified granulomas. Consider further evaluation with contrast-enhanced chest CT."  (Id. at 82.)

On September 18, 2018, Morales had a CT of the chest without contrast.  (Id. at 53-54.)  The results showed 2.5 x 1.8 cm mass-like capacity within the right upper lobe with several groundglass opacities scattered around the right upper lobe.  (Id. at 53.)  "This could represent a malignant or infectious process.  If there is clinical concern for malignancy, a PET CT scan would be recommended for further evaluation.  If an infectious process is suggested, radiographic follow-up would be recommended."  (Id. at 53-54.)

Morales had a scheduled nurse line appointment on September 27, 2018.  (Id. at 38.)  The nurse reported that Morales denied being short of breath and having chest pain and noted that his breathing was even and unlabored and lungs were clear.  (Id.)  The medical notes also indicate that Dr. Wong spoke to patient in detail regarding the CT scan results, and patient agreed to undergo further tests and evaluation.  (Id.)  In medical notes dated October 2, 2018, Dr. Wong

---

[3] For purposes of summary judgment, the Court finds these facts are undisputed following its review of ECF document numbers 48-2 to 48-5, 51-53, 55-57 and documents referenced therein. Where plaintiff has failed to properly address defendant's assertion of fact as required, this Court considers the fact undisputed.  See Fed. R. Civ. Pro. 56(e)(2).

wrote that Morales "refused this visit for follow-up abnormal CT scan of the chest," but Morales

was already informed that "abnormal CT scan of the chest right upper lobe may represent

malignancy or infection.  PET CT scan ordered and follow-up with hematology oncologist

urgently also ordered."  (Id. at 49.)

On October 4, 2018, Morales had a PET CT scan.  (Id. at 122.)  The results showed the

following:

> 1. The RIGHT lung central upper lobe perihilar irregular nodular lesion (about 1.8 x 1.6 cm) is abnormally focally intensely hypermetabolic. Because of the focal intense hypermetabolic activity, findings are therefore highly suspicious for malignancy.
> 2. However, posterior lateral peripheral RIGHT upper lobe patchy irregular opacities (overall area roughly 2.4 x 1.6 cm) are only irregularly mildly metabolically active and more suggestive of an inflammatory process.
> 3. Otherwise, there is no definite hypermetabolic abnormalities elsewhere to suggest a pattern of primary or metastatic malignancy. Gastric and bowel diffuse radiotracer activity can be within physiologic limits.

(Id. at 123.)  On October 9, Dr. Wong noted that "PET CT scan of the chest show right lung

central upper lobe focal intense hypermetabolic activity highly suspicious for malignancy.

Posterior-lateral peripheral right upper lobe mildly metabolic activity suggestion of inflammatory

process."  (Id. at 48.)  He noted there was an urgent referral to hematology oncology dated

October 7 and requested to expedite the urgent referral to further evaluate the patient.  (Id.)

Morales was seen by hematologist/oncologist Dr. Amandeep Gill on October 10, 2018.

(Id. at 84-87.)  She noted that "[t]aking patient's smoking history, CT scan appearance, PET scan

with high standard uptake value [consistent] with lung cancer.  Taking location biopsy may be

risky but can be considered."  (Id. at 86.)  Dr. Gill recommended alpha-fetoprotein should be

done, patient should be referred to pulmonary for pulmonary function and consideration for

bronchoscopy and referred to cardiothoracic surgeon because he may be a candidate for resection.

(Id.)  On October 11, Morales saw Dr. Wong and denied chest pain and reported no shortness of

breath, headache, dizziness, or cough.  (Id. at 45.)  He had another medical visit with Dr. Wong

on October 22 and again denied cough or shortness of breath.  (Id. at 43-44.)

On October 29, 2018, Morales had a consultation with Dr. Deepak Shrivastava.  (Id. at

88.)  The medical notes from that visit state the alpha-fetoprotein levels were normal.  (Id.)
"Patient had a pulmonary function test done at San Joaquin General Hospital PFT lab on
10/24/2018 which was essentially normal spirometry lung volumes and diffusion capacity."  (Id.)
The doctor suspected that the lung mass was bronchogenic carcinoma and referred Morales for
the pulmonary evaluation and for scheduling of bronchoscopy.  (Id. at 89.)

       Dr. Anastassiou evaluated Morales on October 31, 2018.  (Id. at 92-93.)  In a letter from
Dr. Anastassiou to Dr. Wong, Morales's primary care doctor, he stated

> This is a gentleman who has a relatively good lung function who clearly
> has a suspicious lesion which is hypermetabolic in the right upper lung.
> Although a diagnosis has not been established by pathology, this lesion is
> suspicious enough to warrant surgical resection. I do not think a needle
> biopsy by percutaneous routes will be terribly helpful and might even be
> harmful since this lesion is adjacent to a major pulmonary vein. In the
> same respect, I do not think that a bronchoscopy is necessarily going to
> assist us in determining whether or not we should proceed on with
> surgical removal.
>
> My recommendation is that he should undergo a mediastinoscopy and
> right upper lobectomy with thoracic lymph node dissection.  This can be
> accomplished through minimally invasive video-assisted techniques.
>
> I have outlined these recommendations to the patient.  He is in agreement
> to proceed on with surgery as discussed….

(Id. at 93.)  Dr. Anastassiou testified that the likelihood of it being a malignancy was 70 to 95
percent.  (Id. at 135, 138; see also ECF No. 52-1 at 34-35 ("Admit Dr. Anastassiou was aware
tuberculosis cannot always be distinguished from lung cancer in imaging."); id. at 31-32 (admit
that Dr. Anastassiou knew that Morales had diabetes and that diabetes may increase the risk of
getting tuberculosis); id. at 37 (Anastassiou knew that Morales had tuberculosis in the past and
that prisoners have an increased risk of acquiring tuberculosis in prison.); id. at 38-39 (Morales
was not tested for tuberculosis before surgery.))  Morales testified that Dr. Anastassiou reviewed
the scan results with him during the appointment.  (ECF No. 48-4  at 24.)  Dr. Anastassiou told
Morales that he did not believe a bronchoscopy would impact whether or not he did the surgery.
(Id. at 29.)  The doctor also told him the biopsy was risky because the lung mass was close to a
major pulmonary vein and that the biopsy results may not provide additional information to
determine if the mass was cancerous.  (Id. at 30-31.)  Morales agreed to the surgery.  (Id. at 31.)

1    A day later, Morales met with Dr. Wong.  The medical notes from that appointment state

2    "[p]atient deny any chest pain no short of breath no headache no dizziness.  He is agreeable and

3    was told by the specialists that he will be scheduled for thoracic surgery for the treatment of lung

4    cancer." (Id. at 41.)  Dr. Wong saw Morales five days later, on November 6, regarding pain from

5    post right inguinal hernia repair two years ago, and Morales denied cough, shortness of breath,

6    congestion, dyspnea on exertion, wheezing or hemoptysis.  (Id. at 39.)

7    On November 27, 2018, Morales was admitted to California Pacific Medical Center for a

8    planned right VATS lobectomy, mediastinoscopy, and lymph node dissection.  (Id. at 96.)  Dr.

9    Xin Amy Liao noted that Morales had not had any recurrent chest pain since August 2018.  (Id. at

10    99.)  Morales signed the consent to surgery form.  (Id. at 117-20.)

11    On November 28, 2018, Dr. Anastassiou operated on Morales.  (Id. at 109-10.)  The

12    doctor first performed a mediastinoscopy, removing a level 7 lymph node.  (Id. at 110.)  A frozen

13    section of this node, read during surgery, showed no malignancy, but identified a granuloma.  (Id.

14    at 110; ECF No. 52-1 at 22 (Anastassiou testified that although granuloma is not usually

15    associated with cancer, it can coexist in patients with cancer.))  Because he was concerned that

16    the lesion was "representing an infectious process as opposed to a tumor," Dr. Anastassiou

17    proceeded with a right video-assisted thoracoscopy.  (ECF No. 48-4 at 110.)  With palpation, he

18    could see the lesion was deep and there was a firm mass adjacent to the right upper lobe bronchus

19    and in the distal aspect of the right mainstem bronchus.  (Id. at 111.)  "Despite multiple attempts

20    to encircle and identify where this mass was present, we could not safely get around this lesion

21    and get a tissue biopsy." (Id.)  Dr. Anastassiou converted to right thoracotomy and took a direct

22    approach to the mass.  (Id.)  He still could not get to the mass itself "without further compromise

23    of the vasculature to the right upper lobe." (Id.)   As a result, he proceeded with right upper

24    lobectomy and lymph node dissection.  (Id. ("This was conducted in a routine manner although

25    the dissection was quite difficult due to the degree of inflammation around the hilum."))  On

26    November 30, Dr. Jennifer Ling, infectious disease specialist, noted Morales testified positive for

27    tuberculosis and started him on treatment.  (Id. at 113.)  Plaintiff testified that as a result of the

28    surgery, he suffered mental and physical health issues. (ECF No. 52-1 at 11-14, 16.)

1  VI.    Disputed Facts

2          Plaintiff and defendant both submitted expert reports to support their positions.  On behalf

3  of defendant, Dr. Robbin Cohen provided the following opinions:

4          a)  Morales's history made him high-risk for lung cancer, and his recent history did

5              not suggest tuberculosis.

6          b)  His evaluation was completely within the standard of care for all of the physicians

7              involved in his case.

8          c)  Anastassiou's preoperative evaluation of Morales was within the standard of care.

9          d)  Anastassiou's surgical procedure on Morales was also within the standard of care.

10         e)  Although Morales's pathology report showed granulomas, which are consistent

11             with tuberculosis and not lung cancer, Anastassiou did not fall below the standard

12             of care by performing a lobectomy for a lesion that was not lung cancer.

13         f)  Morales's postoperative complications are not known to the procedure and are not

14             evidence that the doctor's fell below the standard of care.

15  (ECF No. 48-3 at 6-8.)

16         On behalf of plaintiff, Dr. Robert Blais opined that Anastassiou breached the standard of

17  care. (ECF No. 53-2 at 10.)  He states that knowing the patient's prior history, Anastassiou

18  should have searched for a tuberculosis diagnosis. (Id. at 10-11.)  After finding the granuloma,

19  Dr. Blais opines that Anastassiou should have ended the surgery and ordered a culture to

20  determine the best course of treatment. (Id. at 11.)  Even if the results showed cancer,

21  Anastassiou "still should have ended the surgery because the cancer would have already

22  metastasized from the lung and should be treated with chemotherapy and radiation, not

23  resection." (Id.)  The difficulty of the procedure due to inflammation should have also clued

24  Anastassiou into the idea that Morales had inflammatory disease, not cancer. (Id. at 12.)

25  VII.   Discussion

26         A.  Eighth Amendment Deliberate Indifference Claim

27         Morales alleges that Anastassiou was deliberately indifferent to his serious medical needs

28  when he removed part of Morales's lung and lymph nodes before performing a biopsy or other

10

1    test to rule out tuberculosis.  (ECF No. 31 at 9-12.)  Anastassiou argues that summary judgment is

2    appropriate on this claim because "[n]egligence is a lower standard than deliberate indifference,

3    and since Mr. Morales will not be able to disprove this lower standard, he will not be able to

4    provide evidence to support the heightened standard required to prove deliberate indifference."

5    (ECF No. 48-1 at 14-17.)

6        The treatment a prisoner receives while incarcerated and the conditions of his confinement

7    are subject to the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25, 31 (1993); see also

8    DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 198-200 (1989).  A prison

9    official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious

10    medical needs of an inmate.  See Farmer v. Brennan, 511 U.S. 825, 828 (1994); Wilson v. Seiter,

11    501 U.S. 294, 297 (1991); Estelle v. Gamble, 429 U.S. 97, 104 (1976); Doty v. County of Lassen,

12    37 F.3d 540, 546 (9th Cir. 1994).  To state a claim, the prisoner must show that (1) objectively,

13    the prison official's deprivation was sufficiently serious, and (2) subjectively, the prison official

14    acted with sufficiently culpable state of mind.  See Wilson, 501 U.S. at 298-99.  The Eighth

15    Amendment's deliberate indifference standard is a "high legal standard."  See Toguchi v. Chung,

16    391 F.3d 1051, 1060 (9th Cir. 2004).

17        To meet the objective standard, the plaintiff must show that the medical need is serious.

18    A medical need is serious "if the failure to treat the prisoner's condition could result in further

19    significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin v. Smith, 974

20    F.2d 1050, 1059 (9th Cir. 1991) (citation omitted), overruled on other grounds by WMX Techs.,

21    Inc. v. Miller, 104 F.3d 1133 (9th Cir.1997) (en banc).  If a prisoner establishes the existence of a

22    serious medical need, he must also meet the subjective standard, showing that prison officials

23    responded to the serious medical need with deliberate indifference.  Farmer, 511 U.S. at 834.

24    "[T]he official must both be aware of facts from which the inference could be drawn that a

25    substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  In

26    general, deliberate indifference may be shown when prison officials deny, delay, or intentionally

27    interfere with medical treatment, or in the way prison officials provide medical care.  Hutchinson

28    v. United States, 838 F.2d 390, 394 (9th Cir. 1988).

11

1    The parties do not dispute that Morales's condition presented a serious medical need.

2    (ECF No. 48-1 at 14-15; ECF No. 53 at 9.)  If, as here, Morales has established a serious medical

3    need, he must also show that Anastassiou's response to that need was deliberately indifferent.

4    Anastassiou argues that he acted "expeditiously and in consideration of Mr. Morales' serious

5    medical condition."  (ECF No. 48-1 at 14-15.)  Because he acted in accordance with the standard

6    of care, Anastassiou claims his acts do not rise to the level of deliberate indifference.  (Id.)

7    Morales disagrees, contending that Anastassiou acted with deliberate indifference when he

8    removed the upper lobe of his lung despite his awareness of that it was likely inflammatory

9    disease.  (ECF No. 53 at 11.)

10    "A showing of medical malpractice or negligence is insufficient to establish a

11    constitutional deprivation under the Eighth Amendment."  Toguchi, 391 F.3d at 1060; see also

12    Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) ("While poor medical treatment will

13    at a certain point rise to the level of a constitutional violation, mere malpractice, or even gross

14    negligence, does not suffice.")  To establish deliberate indifference, plaintiff "must show that the

15    course of treatment the doctors chose was medically unacceptable under the circumstances" and

16    that the doctors "chose this course in conscious disregard of an excessive risk to plaintiff's

17    health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996), overruled in part on other

18    grounds by Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014) (en banc); see also Hamby v.

19    Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016); Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir.

20    2012)).  "Accepted standards of care and practice within the medical community are highly

21    relevant in determining what care is medically acceptable and unacceptable."  Edmo v. Corizon,

22    Inc., 935 F.3d 757, 786 (9th Cir. 2019) (per curiam).  A mere difference in opinion concerning the

23    appropriate medical treatment however cannot be the basis of an Eighth Amendment claim.

24    Jackson, 90 F.3d at 332.  To determine whether the treatment was medically acceptable, this

25    Court must consider "the record, the judgments of prison medical officials, and the views of

26    prudent professionals in the field…."  Edmo, 935 F.3d at 786.

27    First, to show deliberate indifference, Morales must demonstrate that Anastassiou's course

28    of treatment was medically unacceptable.  Viewing the evidence in the light most favorable to the

12

nonmoving party, Morales has not made this showing.  Throughout the relevant time period, Morales was seen by numerous doctors and underwent various tests to determine the cause of his chest pain.  The medical tests did not reach a conclusive result; instead, they indicated either a malignancy or infection.  (See, e.g., ECF No. 48-4 at 82 (August 2018 x-rays results show "[m]ild nodularity in both lungs of uncertain etiology.  These could reflect calcified granulomas.  Consider further evaluation with contrast-enhanced chest CT); id. at 53-54 (September 2018 CT scan without contrast shows mass in right upper lobe that "could represent a malignant or infectious process.  If there is clinical concern for malignancy, a PET CT scan would be recommended for further evaluation.  If an infectious process is suggested, radiographic follow-up would be recommended."); id. at 38, 49 (September 2018 visit with Dr. Wong, who noted "abnormal CT scan of the chest right upper lobe may represent malignancy or infection. PET CT scan ordered and follow-up with hematology oncologist urgently also ordered"); id. at 123 (PET CT scan was suggestive of both malignancy and inflammatory process); id. at 48 (Dr. Wong reviewed PET CT scan results and expedited the urgent referral to hematology oncology); id. at 84-87 (hematologist/oncologist said his results are consistent with lung cancer, recommended alpha-fetoprotein test, and referred him to a pulmonologist for pulmonary function and cardiothoracic surgeon for possible resection); id. at 88-89 (non-defendant doctor noted the right lobe mass was likely cancer but referred him for a pulmonary evaluation and bronchoscopy); id. at 93.)

After all these steps, Morales visited Dr. Anastassiou, a thoracic surgeon.  Dr. Anastassiou wrote that "[a]lthough a diagnosis has not been established by pathology, this lesion is suspicious enough to warrant surgical resection."  (Id. at 93.)  He reasoned that "a needle biopsy by percutaneous routes" will not be helpful and could be harmful given the proximity to a major pulmonary vein.  (Id.)  Nor would a bronchoscopy assist in determining the necessity of surgical removal.  (Id.)  Dr. Anastassiou testified that the likelihood of the mass being a malignancy was 70 to 95 percent.  (Id. at 135, 138.)  He explained all of this to Morales, who agreed to the surgery.  (Id. at 31, 117-20.)  During the surgery, Anastassiou performed a mediastinoscopy with biopsy of level 7 lymph node which showed no malignancy, but a granuloma.  He then proceeded

13

1  to a thoracoscopy, but he could not resect the mass given the vasculature structure of the right

2  upper lobe.  (Id. at 111.)

3        Morales and Anastassiou disagree about whether Anastassiou's course of treatment was

4  medically acceptable and submitted expert reports to support their position.  Anastassiou's expert

5  Dr. Cohen opined that Anastassiou's course of treatment was within the standard of care.  (ECF

6  No. 48-3 at 6-7.)  He further opined that

7        The standard of care calls for thoracic surgeons to do their best to
        never miss the opportunity to remove and cure lung cancers,
8        especially in their early stages when they are the most curable. This
        sometimes means surgically resecting a lesion that is not cancer in
9        patients who are high risk for lung cancer. Observing pulmonary
        lesions or attempts at medical therapy in high risk patients runs the
10       risk of allowing lung cancers to proceed to advanced disease and
        death.  Mr. Morales' smoking history, history of previous
11       tuberculosis, and imaging studies made a diagnosis of lung cancer
        highly likely (easily more likely than not), making his surgical
12       resection within the standard of care for a thoracic surgeon.

13  Id. at 7.  In opposition, Morales submitted an expert report by Dr. Robert Blais, a cardiothoracic

14  and vascular surgeon, who concluded that "Dr. Anastassiou should have pursued a medical

15  workup, perhaps assisted by a pulmonary medicine consultant, to search for the diagnosis of

16  tuberculosis."  (ECF No. 53-2 at 10.)  Although the medical tests results indicated malignancy

17  and inflammatory process, Dr. Blais claims that Anastassiou should have made a more "vigorous

18  attempt" to rule out cancer before surgery.  (Id. at 11.)  During the operation, Dr. Blais opines that

19  Anastassiou should have stopped the surgery regardless of whether the granuloma was positive or

20  negative for cancer.  (Id.)  If the granuloma was negative for cancer (as it was), Anastassiou

21  should have ended the surgery and ordered a culture test before deciding on the course of

22  treatment.  (Id.)  If it was positive, Dr. Blais states that surgery was inappropriate because the

23  "cancer would have already metastasized from the lung and should be treated with chemotherapy

24  and radiation, not resection."  (Id.)  The difficulty of the surgery, Dr. Blais argues, should also

25  have alerted Anastassiou that the issue was inflammatory disease not cancer.  (Id. at 12.)

26        These diverse findings merely reflect a difference of opinion on the necessity of the

27  surgery.  "[A] mere disagreement about of medical opinion between experts does not demonstrate

28  deliberate indifference as a matter of law."  Porretti v. Dzurenda, 11 F.4th 1037, 1048 (9th Cir.

1    2021).  The battle of experts here does not create a material issue of fact as to whether

2    Anastassiou chose a medically unacceptable course of treatment.

3            Second, even assuming that Anastassiou's course of treatment was medically

4    unacceptable, this Court concludes that there is no genuine issue of material fact that Anastassiou

5    chose this treatment out of conscious disregard of an excessive risk to Morales's health.  In his

6    October 31, 2018 letter to Dr. Wong, Anastassiou explained that Morales "has relatively good

7    lung function who clearly has a suspicious lesion which is hypermetabolic in the right upper lung.

8    Although a diagnosis has not been established by pathology, this lesion is suspicious enough to

9    warrant surgical resection."  (ECF No. 48-4 at 93.)  He considered a needle biopsy by

10   percutaneous routes and a bronchoscopy but rejected both courses of treatment because they were

11   unlikely to be helpful and might even be harmful.  (Id.)  Anastassiou recommended a

12   mediastinoscopy and right upper lobectomy with thoracic lymph node dissection through

13   minimally invasive video-assisted techniques.  (Id.)  Although he knew that Morales had

14   tuberculosis in the past, prisons increase a person's risk of getting it, and Morales had not been

15   tested for tuberculosis, Anastassiou estimated that there was a 70 to 95 percent likelihood that the

16   mass was malignant.  (Id. at 135, 138; see also ECF No. 52-1 at 31-32, 34-35, 37-39.)  Morales

17   agreed to the procedure.  (Id. at 31, 93, 117-20.)  Anastassiou performed the mediastinoscopy and

18   thoracoscopy, and due to difficulty in dissecting the mass, he proceeded with the right upper

19   lobectomy and lymph node dissection.  (Id. at 111.)  The undisputed facts demonstrate that

20   Anastassiou thoughtfully considered the options and carefully performed the course of treatment.

21   The mere fact that his diagnosis of potential lung cancer diagnosis was incorrect is not enough to

22   rise to the level deliberate indifference.

23           Because there is no genuine issue of material fact on this claim, this Court recommends

24   granting Anastassiou's motion for summary judgment on Morales's Eighth Amendment claim.

25                   B.  State Law Medical Malpractice Claim

26           Based on the above recommendation, this Court declines to exercise supplemental

27   jurisdiction over plaintiff's state law claim and recommends dismissing it without prejudice.

28   Wade v. Regional Credit Ass'n, 87 F.3d 1098, 1101 (9th Cir. 1996).

1    VI.  <u>Conclusion</u>

2         Accordingly, IT IS HEREBY RECOMMENDED that:

3         1.   Defendant's motion for summary judgment (ECF No. 48) be granted as to plaintiff's

4              federal law claim; and

5         2.   Dismiss the state law claim without prejudice in light of the dismissal of plaintiff's

6              federal claim.

7         Furthermore, IT IS HEREBY ORDERED that:

8         1.   Plaintiff's requests for judicial notice (ECF Nos 50-2 & 58) are denied; and

9         2.   Plaintiff's motion for leave to file a sur-reply in opposition to the summary judgment

10             motion (ECF No. 59) is denied.

11        These findings and recommendations are submitted to the United States District Judge

12   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

13   after being served with these findings and recommendations, any party may file written

14   objections with the court and serve a copy on all parties.  Such a document should be captioned

15   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

16   objections shall be filed and served within fourteen days after service of the objections.  The

17   parties are advised that failure to file objections within the specified time may waive the right to

18   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

19   Dated:  November 29, 2022

20

21                                          KENDALL J. NEWMAN
                                            UNITED STATES MAGISTRATE JUDGE
22

23   TAA/Mora0794.msj.kjn

24

25

26

27

28

                                    16